IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AUSTIN MARTIN SIAMPWIZI | Criminal Action No.<br><br>1:23-CR-246-WMR-RDC-1 |

**Government's Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Sarah E. Klapman, Assistant United States Attorney for the Northern District of Georgia, files this Sentencing Memorandum addressing the advisory Guidelines range application to Defendant Siampwizi and the Government's recommendation for an appropriate sentence based on the factors set forth in Title 18, United States Code, Section 3553(a).

I.     **Factual and Procedural Background**

Defendant Siampwizi, who has a previous federal conviction for drug trafficking and a previous state conviction for, *inter alia*, forgery and fraud, pleaded guilty to money laundering conspiracy involving unemployment insurance funds. During the COVID-19 pandemic, unemployment insurance fraud became particularly attractive due to the federal supplement to state unemployment insurance benefits, an approximately $600 per week additional payment that was not available prior to the Coronavirus Aid, Relief, and Economic Security Act, which was signed into law by President Trump on March

27, 2020.

This case began as a joint investigation among the Department of Labor, Office of the Investigator General ("DOL-OIG"); the United States Secret Service ("USSS"); Internal Revenue Service, Criminal Investigation ("IRS-CI"); the United States Postal Inspection Service ("USPIS"); the United States Department of Homeland, Security Homeland Security Investigations ("DHS-HIS"); and the Federal Bureau of Investigation ("FBI").

In the spring of 2020, the Employment Security Department of Washington State ("WA-ESD"), Washington's state workforce agency, experienced a high volume of fraudulent unemployment insurance applications. Fraudsters would submit unemployment insurance applications using stolen personal identifiable information ("PII") of real individuals to WA-ESD. Often, the fraudster would provide a Green Dot account number or bank account number for WA-ESD to deposit the unemployment insurance proceeds. WA-ESD then paid these claims onto Green Dot cards or into the bank accounts. Data obtained by DOL-OIG indicated that a significant number of money orders were purchased in the Northern District of Georgia using Green Dot cards loaded with fraudulent unemployment proceeds from WA-ESD.

The fraudulent unemployment proceeds from WA-ESD were either deposited into business bank accounts set up by Siampwizi's co-conspirators or on Green Dot cards. Once funds obtained through fraud were received by the accounts, Siampwizi's co-conspirators quickly moved the money through interstate and foreign wire transfer, cash or check withdrawals, debit card transactions, and the

purchase of money orders. Siampwizi cashed money orders that were made payable to him and purchased by co-conspirators with fraud proceeds in the Northern District of Georgia. Money followed through this scheme as follows:

> Fraudulent Claim → State Workforce Agency → Green Dot Card or Business Bank Accounts → Money Order Made Payable to Siampwizi → Cash

During the investigation, law enforcement discovered that Siampwizi cashed money orders that were purchased using a debit card linked to a JP Morgan Chase Bank ("Chase Bank") savings account (ending in x1082) and a Chase Bank checking account (ending in x5812). These accounts received 22 deposits from the ESD between May 12, 2020, and May 13, 2020 — the unemployment proceeds of 22 individuals whose PII been stolen as a part of the scheme.

| Bank Account | Total Deposits |
|---|---|
| Chase Bank ending in x1082 | $111,224.00 |
| Chase Bank ending in x5812 | $96,420.00 |
|  | $207,644.00 |

Siampwizi's co-conspirators then purchased money orders at various locations throughout the metropolitan Atlanta area. These money orders were made payable to Siampwizi. In May 2020, Siampwizi cashed 57 money orders, totaling $52,800.00, which had been purchased using funds from the Chase Bank accounts. Law enforcement also discovered Siampwizi cashed money orders that were purchased using Green Dot Bank cards. Including the money orders purchased from the Chase Bank accounts, in a seven-day period, between May 13, 2020, and May 19, 2020, Siampwizi cashed 269 money orders, totaling

$175,642.99. Siampwizi's co-conspirator, Gabriel Kalembo, cashed approximately $75,000 in money orders at the same location (Doc. 32-1, ¶ 14(b)(n.1)).

Along with the money laundering conspiracy and money laundering, law enforcement's investigation revealed Siampwizi submitted a fraudulent unemployment insurance application in March 2020 to the Georgia Department of Labor ("GDOL"). As a result of this fraudulent application, from March 2020 to February 2021, Siampwizi received $29,370.00 in unemployment proceeds from the GDOL.

This investigation also showed that Siampwizi submitted fraudulent Payroll Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") applications using two corporate entities that Siampwizi incorporated: Global Car Rental, LLC, and Global Group Development & Construction, LLC ("Global Group"). Siampwizi submitted these fraudulent applications from April 3, 2020, to April 9, 2021.

| Loan Application # | Corporate Entity | Amount Funded |
|---|---|---|
| EIDL ending in x2793 | Global Car Rental | $0.00 |
| EIDL ending in x4337 | Global Car Rental | $69,900.00 ($70,000.00 minus $100.00 processing fee) |
| PPP ending in x7410 | Global Group | $42,400.00 (loan) + 5,000.00 (advance) |
| PPP ending in x8708 | Global Group | $20,832.00 |
| EIDL ending in x4337 | Global Group | $20,832.00 |
|  |  | $158,964.00 |

Three organizational victims have been identified in this case: two state

4

workforce agencies and the Small Business Administration (PSR, ¶ 57). There were at least 70 individuals whose PII was stolen and used to file fraudulent unemployment insurance claims.[1]

On December 14, 2023, Siampwizi pleaded guilty to money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h), as charged in Count One of the Indictment, pursuant to a plea agreement (1:23-CR-246, Docs. 1, 32). In the plea agreement, Siampwizi admitted to personally laundering at least $175,600 as part of the money laundering conspiracy (Doc. 32, ¶ 14). He also admitted to fraudulently obtaining approximately $150,000 in Economic Injury Disaster Loans and Paycheck Protection Program loans for his two businesses (*Id.*).

## II.    The PSR

The United States Probation Office issued its final Pre-Sentence Investigation

---

[1] Because of the structure of this money laundering scheme, identification of victims can be challenging. To trace the source of funds back to the state workforce agency, law enforcement obtained records for money orders purchased from, for example, the United States Postal Service. Money orders were also purchased from other sources, and records were not always available from those sources. Law enforcement then obtained Green Dot records after determining Green Dot account numbers from money order purchase records. Finally, law enforcement requested data from state workforce agencies to link individual claims with Green Dot cards. As a result of the lack of records and this arduous process, many individual victims were not identified and may not be aware their PII was stolen. Additionally, law enforcement could not notify states that fraudulent claims were filed for these unidentified victims, which could cause difficulties for individuals who later seek unemployment insurance assistance.

Report on March 19, 2024. The PSR assesses a base offense level of 20 (PSR, ¶ 60). Siampwizi receives a two-level upward adjustment under U.S.S.G. § 2S1.1(b)(2)(B) for a conviction under 18 U.S.C. § 1956 (PSR, ¶ 61). After receiving a three-level reduction for acceptance of responsibility, Siampwizi has a total offense level of 19 (PSR, ¶¶ 67-68). The PSR also determined Siampwizi has a criminal history score of six and a criminal history category of III (PSR, ¶¶ 75-76). The corresponding advisory Guidelines range for offense level 19 and criminal history category III is 37 to 46 months.

### A. Siampwizi's Objections to the PSR

Siampwizi has seven objections and/or clarifications to the PSR: (1) he did not transfer funds, make cash or check withdrawals, engage in debit card transactions, or purchase money orders; (2) he did not purchase money orders at Kroger and the United States Post Offices; (3) he did not purchase money orders from Publix using Green Dot bank cards; (4) his loss should be confined to the money laundering conspiracy that he pleaded guilty to as a part of the WA-ESD unemployment scheme, not every other fraud scheme in which he may have engaged, such as the Georgia unemployment and the PPP and EIDL loan schemes; (5) his restitution should be limited to the WA-ESD unemployment scheme; (6) his loss amount is less than $250,000, and his base offense level should be 18; and (7) his total offense level should be 16.[2] The Government does

---

[2] This objection appears to have a mathematical error. If Siampwizi's base level offense should be 18, as Siampwizi argues in his sixth objection to the PSR; Siampwizi receives an enhancement under U.S.S.G. § 2S1.1(b)(2)(B) for a conviction under 18 U.S.C. § 1956 (+2); and Siampwizi receives credit for his

not disagree with Siampwizi as to his first three objections.[3] The remaining four objections will be discussed further below.

### B. Siampwizi's loss amount, restitution, and Guidelines calculations properly include Siampwizi's other COVID-19-related fraud schemes.

Siampwizi argues that his loss amount, restitution, and Guidelines calculations should not include the Georgia unemployment or PPP and EIDL loan schemes because Siampwizi only pleaded guilty to the money laundering conspiracy that was part of the WA-ESD unemployment scheme.

Proper Guidelines calculations require consideration of all relevant conduct. *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014). Section 1B1.3 establishes several types of relevant conduct. For certain types of offenses, Section 1B1.13(a)(2) provides that an expanded range of relevant conduct, often referred to as "expanded relevant conduct," including certain actions and omissions that took place on occasions beyond the charged offense, are to be considered. In assessing relevant conduct for an offense to which (a)(2) applies, the Court must consider all the conduct described in (a)(1) and include it not just when it was done in preparation for, during, or in the course of avoiding

---

acceptance of responsibility (-3), Siampwizi's total offense level would be 17 (*See* PSR, ¶¶ 60-68).

[3] The Government has no evidence that Siampwizi personally performed the activities discussed in Siampwizi's first three objections. But this information gives the Court context because these activities were undertaken by Siampwizi's co-conspirators as a part of and in furtherance of the money laundering scheme.

detection for the offense of conviction, but also if it was done as part of the "same course of conduct or common scheme or plan" as the conviction. U.S.S.G. § 1B1.3(a)(2). These two phrases have distinct but related meanings. Siampwizi's other fraud schemes satisfy both provisions.

### i. Common scheme or plan

First, for two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as: common victims, common accomplices, common purpose, or similar modus operandi. *See* U.S.S.G. § 1B1.3 app. note 5(B)(i); *United States v. Valladares*, 544 F.3d 1257, 1268 (11th Cir. 2008) (separate health care fraud scheme involving nearly identical conduct was part of a common scheme or plan); *United States v. Fuentes*, 107 F.3d 1515, 1525 (11th Cir. 1997) (citation omitted) (noting only one common factor is required). Here, Siampwizi's schemes defrauded the same type of victim: government agencies. And the WA-ESD unemployment fraud underlying the money laundering conspiracy has the same purpose and modus operandi as Siampwizi's Georgia unemployment, PPP, and EIDL schemes: to make money by filing fraudulent applications to government agencies to obtain proceeds intended for COVID-19 relief.

### ii. Same course of conduct

Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 app.

note 5(b)(ii). To determine whether offenses have the same course of conduct, the Court looks to numerous factors, including the degree of similarity of the offenses, the regularity of the offenses, and the time interval between the offenses. *Id.*

Here, if Siampwizi had also been convicted of the wire fraud schemes, the offenses would have been grouped together as "closely related" under U.S.S.G. § 3D1.2(d) because the offense levels are determined largely by loss amount. *See* U.S.S.G. §§ 2B1.1, 2S1.1. The nature of the offenses is a relevant consideration. *See, e.g.*, *United States v. Jones*, 199 F. App'x 812, 816 (11th Cir. 2006) (fraud committed prior to a previous term of incarceration was in the same course of conduct as the instant offense, given the similarity in modus operandi). The offense of conviction, money laundering conspiracy, necessarily involved a specified unlawful activity, specifically the unemployment insurance fraud scheme targeting WA-ESD, that is similar to Siampwizi's other fraud schemes. Additionally, the schemes are all wire fraud offenses that occurred repeatedly within a 13-month period.

Because Siampwizi's other COVID-19-related fraud schemes are relevant conduct, the loss amount, restitution, and Guidelines calculations properly include Siampwizi's other COVID-19-related fraud schemes. *See* U.S.S.G. § 1B1.3(a)(2).

**III.   A low-end Guidelines sentence of imprisonment followed by three years of supervised release is reasonable considering the factors set forth in Title 18, United States Code, Section 3553(a).**

The Court must first correctly calculate the applicable Guidelines range, and then consider the § 3553(a) factors in determining the appropriate sentence. Section 3553(a) requires district courts to consider these factors in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect (A) the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to provide general deterrence; (C) to provide specific deterrence; and (D) to provide the defendant with appropriate rehabilitation options; (3) the kinds of sentences available; (4) the advisory Guidelines range; (5) the Guidelines' policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. 18 U.S.C. § 3553(a)(1)–(7). "The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court." *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007) (quotation marks omitted).

The COVID-19 pandemic fundamentally changed the United States, affecting almost every aspect of social interaction and human activity, including how criminals earned money and laundered their proceeds. Fraudsters here and abroad heavily exploited government-led economic support programs during the pandemic, exploiting our country during a time of unprecedented crisis when we were most vulnerable. Money launderers like Siampwizi facilitate and conceal crime—the fraudsters here could not have enjoyed the fruits of their

10

crimes without a money launderer to help conceal their criminal conduct. Money laundering harms our society and undermines our financial systems, which is why the Government seeks to detect, punish, and deter these separate harms.

The Government has received victim impact statements from individuals deeply impacted by this conspiracy. Portions of these statements from three victims are excerpted below:

- "I felt violated when I discovered someone had stolen my personal information to fraudulently use my name to unlawfully claim unemployment benefits."
- "This is a serious crime against individuals, the state, and country during a particularly troubling time period in our nation's history: COVID trauma."
- "We all work hard for what we have for ourselves, family, or loved ones. Most of us contribute to society [and] when individuals or groups . . . dedicate their lifes [sic] to rob others for their satisfaction, lazines [sic] I believe they belong in prison away from harming others the way they do."
- "Mr. Siampwizi's actions were a hassle as I had to file reports, alert creditors, and overall become very vigilant. This took time and energy . . . I work with students who had they been unable to get unemployment would have been homeless. I feel like his actions were extremely selfish and short sighted."

The Court should also consider specific and general deterrence. Siampwizi's criminal history reflects that he has not been deterred from criminal conduct by either shorter custodial sentences or non-custodial sentences. The Eleventh

Circuit has also recently spoken about general deterrence in white collar cases:

> General deterrence is more apt, not less apt, in white collar crime cases. The reason is that economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, which makes them prime candidates for general deterrence. White collar criminals often calculate the financial gain and risk of loss of their crimes, and an overly lenient sentence sends the message that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty.

*United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) (internal quotations and citations omitted).

A low-end Guidelines sentence also avoids unwarranted sentence disparities with his co-conspirators. Two of Siampwizi's co-conspirators, Gabriel Mutambo Kalembo and Bamidele Muraina, have been sentenced for their roles in this offense (*See* 1:20-CR-284, Docs. 86, 88).

- Kalembo pleaded guilty to money laundering conspiracy and was sentenced to 50 months in prison with three years of supervised release to follow (1:20-CR-284, Docs. 1, 86). Kalembo received an aggravating role enhancement, as he recruited others into the conspiracy and directed their activities. He also had a recent federal conviction for conspiracy to commit wire and bank fraud (*See* 1:17-CR-110, Docs. 14, 40). Unlike Kalembo, Siampwizi receives no role enhancement and will be sentenced after Amendment 821, which provides that Siampwizi will receive no status points for his recent criminal convictions (*See* PSR, ¶¶ 63, 75).
- Muraina pleaded guilty to theft of government funds and aggravated

identity theft and was sentenced to 70 months in prison (46+24) with three years of supervised release to follow (1:20-CR-284, Docs. 1, 73). Muraina perpetrated the fraud in the underlying unemployment insurance scheme and a separate tax fraud scheme (*See* 1:20-CR-284, Doc. 73-1 at 3, 6). He received upward adjustments for the number of victims and sophisticated means, and the Court downwardly departed following a motion from the Government (*See id.*).

### IV.    Conclusion

The Government respectfully urges the Court to sentence Siampwizi to a low-end Guidelines term of imprisonment followed by three years of supervised release.

Respectfully submitted,

RYAN K. BUCHANAN
  *United States Attorney*


/S/ SARAH E. KLAPMAN
  *Assistant United States Attorney*
Georgia Bar No. 437221
sarah.klapman@usdoj.gov